**Sylvester J. VAUGHNS, Jr., etc., et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.**

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.**

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY, et al.**

**Civ. Nos. 72–325–K, K–81–2597.**

United States District Court, D. Maryland.

Nov. 9, 1984.

Richard V. Falcon, Baltimore, Md., Joseph M. Hassett, David S. Tatel, John C. Keeney, Jr., Patricia A. Brannan and Hogan and Hartson, Washington, D.C., Thomas I. Atkins, Michael Sussman and Teresa Demchak, NAACP Special Contribution Fund, Brooklyn Heights, N.Y., William L. Robinson and Norman J. Chachkin, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

Paul M. Nussbaum and Andrew W. Nussbaum, Mount Rainier, Md., and George D. Solter, Alfred L. Scanlon, Jr., and Gerson B. Mehlman, Baltimore, Md., for defendants.

FRANK A. KAUFMAN, Chief Judge.

Presently before this court is plaintiffs' request for attorney's fees and expenses under 42 U.S.C. § 1988 and 28 U.S.C. § 1920 [1] in connection with the most recent phase of desegregation litigation concerning the schools of Prince George's County, Maryland. The history of this litigation stretches back to 1972 when *Vaughns v. Board of Education of Prince George's County*, 355 F.Supp. 1034, was first filed. On March 13, 1975, this court issued a Memorandum and Order in *Vaughns* closing the court file subject to the right of any party to petition the court to reopen the case. From the date of that Memorandum and Order until September 1, 1981, there were no developments in *Vaughns*. On that latter date, some of the original plaintiffs in *Vaughns* filed a motion to reopen, challenging defendants' conduct of the Prince George's County school system in seven areas: faculty hiring, faculty assignments, special education for the handicapped, special education for the talented and gifted, student discipline, student classroom assignments and student assignments to schools. With regard to each of those areas, plaintiffs raised three issues: whether defendants had eliminated all vestiges of the pre-1973 discrimination which was the subject of the first phase of the *Vaughns* litigation, whether defendants had engaged in any acts of intentional discrimination from 1973 to the time of trial in 1982, and whether during that period of years defendants had violated any outstanding order or decree of this court.

Defendants challenged the motion to reopen on a number of grounds including lack of subject matter jurisdiction. Although rejected by this court, those contentions did lead plaintiffs in *Vaughns* to file, as a precautionary measure, a new case, *National Association for the Advancement of Colored People v. Board of Edu-*

---

**1.** 42 U.S.C. § 1988 authorizes a federal district court to "allow the prevailing party ... a reasonable attorney's fee as part of the costs" in a proceeding to enforce provisions of the post-Civ-

il War and the 1964 Civil Rights Acts. 28 U.S.C. § 1920 provides for taxation of costs by a judge or clerk of court.

*cation of Prince George's County,* Civil No. K–81–2596 (*NAACP*), which repeated the allegations made by plaintiffs in *Vaughns.*[2] Shortly after *NAACP* was instituted, *Vaughns* and *NAACP* were consolidated for all purposes pursuant to Federal Rule of Civil Procedure 42(a). After a period of intensive discovery during the last two months of 1981 and the early part of 1982, the *Vaughns* and *NAACP* cases were tried before the court in May and June, 1982. Trial lasted twenty-five days and was recorded in approximately 5,100 transcript pages. Twenty witnesses were called and approximately 450 exhibits were introduced.[3] After trial, this court, in its opinion, *Vaughns v. Board of Education of Prince George's County,* 574 F.Supp. 1280 (D.Md.1983), determined that plaintiffs' allegations with regard to all areas except student assignments to schools were without merit.[4]

In the area of student assignments to schools, this court held that defendants had violated outstanding orders of the court and had not eliminated all vestiges of the prior discriminatory system or achieved unitary status at any time since 1973, but that the evidence did not support a finding that "defendants ... acted with purposeful intent to discriminate on racial grounds or to cause resegregation." *Id.* at 1371. In an Order filed on September 20, 1983, this court resumed jurisdiction in *Vaughns,* adjusted the previously imposed 10%–50% guidelines for black pupil population to 10%–80%, affirmed the previously imposed thirty-five minute transportation guidelines, and required annual and semi-annual reports concerning the racial balance of Prince George's County schools. Defend-

ants were also required to take all reasonable actions to achieve unitary status as quickly as possible and to take that requirement into account as "one of the factors to be considered by defendants in connection with the making of *all* decisions by defendants" (emphasis in original). Finally, the Order mandated that defendants state in writing in connection with "all formal memorializations of defendants' decisions with respect to school openings and closings, student attendance areas, and conversions to middle schools or like reorganizations ... the impact of such decisions on the racial composition of the schools in question." However, the Order mandated no adjustments in student attendance areas and did not reverse any of the changes made since 1975. Those rulings and that relief form the basis of plaintiffs' claim to be a "prevailing party" under 42 U.S.C. § 1988. In their petition for attorney's fees and expenses, plaintiffs state that a total of 7,538.8 hours of attorney, law clerk, and paralegal time were spent in connection with *Vaughns* and *NAACP* from May, 1980, through to the date of the request for attorney's fees, October 11, 1983.[5] In their original submission, plaintiffs asked for compensation for 6,055.3 hours at an average rate of $104.20 per hour for a total of $630,957.75 plus expenses of $32,541.51. In support of that request, plaintiffs' attorneys submitted affidavits based upon time records contemporaneously maintained by them. Those affidavits detail on a day-to-day basis the activities of plaintiffs' counsel in connection with this litigation.

---

**2.** The main difference between *Vaughns* and *NAACP* is that the former was filed in 1972 as a class action and was so considered during the recent phase of the litigation whereas the latter is not a class action. The circumstances which led to the filing of *NAACP* are detailed at pages 80–90 of the transcript of the hearing held on September 28, 1981.

**3.** There were 232 docket entries in the *Vaughns* case from the date on which the motion to reopen was filed through the issuance of the Order of September 20, 1983 concerning relief.

**4.** In connection with faculty hiring, this court did conclude that defendants failed to meet the goals set forth in the 1974 consent decree but also stated that the school system "seemingly has done as well as it could do" in the area of faculty hiring. 574 F.Supp. at 1292.

**5.** Plaintiffs have not asked for any compensation for work done between that date and the date of this opinion with regard to the fee and expense issues. This court's understanding is that no claim will be made for compensation for such work.

The difference between the gross total of 7,538.8 hours and the request for compensation based on 6,055.3 hours consists of some 1,243.25 hours of time incurred before September 1, 1981 for which plaintiffs are making no claim [6] and of approximately 240.25 hours which plaintiffs' records indicate were spent solely on issues with regard to which they did not prevail. The remainder of the hours were, according to plaintiffs, either devoted entirely by their counsel to the issue of student assignments to schools or to tasks which were relevant to several issues, including that said issue, and are not subject to allocation among those several issues. In an amended request, plaintiffs have suggested a 27% reduction to account for such indivisible time. Plaintiffs arrived at the 27% figure by calculating, on the basis of a review of the trial transcript, the percentage of time spent at trial on issues in connection with which plaintiffs have not prevailed. That reduction, together with certain other minor adjustments, yields a total revised plaintiffs' request for fees in the amount of $458,679.07.

Plaintiffs' suggested average hourly rate of $104.20 per hour uses as its base, with two exceptions, the hourly rates charged by plaintiffs' counsel, Hogan & Hartson, to their regular clients as of August 31, 1983. The two exceptions are Messrs. Chachkin and Taylor, who have no formal association with Hogan & Hartson and who request hourly rates of $150 and $175 per hour, respectively. Hogan & Hartson attorney time is billed at $70–$110 per hour for the range of associates who worked on this litigation and at $155 per hour for the two partners involved, Messrs. Hassett and Tatel. Plaintiffs also request compensation for time spent by law clerks and paralegals employed by Hogan & Hartson at the rate of $35–$60 per hour.

With regard to expenses, plaintiffs' original claim has been reduced by plaintiffs'

counsel and, as revised, is broken down as follows for the period 1981–83:

| | |
|---|---|
| Local transportation | $ 1,022.73 |
| Out-of-town transportation | 5,465.83 |
| Postage/freight/telephone | 1,955.99 |
| Computer research | 881.83 |
| Outside photocopying | 300.78 |
| Inside photocopying | 9,557.25 |
| Depositions & transcripts | 7,832.27 |
| Court costs | 220.50 |
| Staff overtime | 3,545.51 |
| Total | $30,782.69 |

## I

Defendants, in their opposition to plaintiffs' request, do not challenge plaintiffs' status as "prevailing parties" in this litigation. Defendants do contend, however, that plaintiffs have incorrectly applied the teachings of *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), in several important respects. First, defendants argue that plaintiffs' documentation is inadequate and inaccurate. Second, defendants contend that plaintiffs have failed to show that the hours spent by their counsel were "reasonably expended." In particular, defendants allege that plaintiffs' counsel "have failed to make any effort to delete excessive, unnecessary and duplicative time" and that the quality of counsel's efforts was such that "very little if any of plaintiffs' counsel's time was reasonably expended." Third, defendants contest the reasonableness of plaintiffs' claimed hourly rates and point to recent awards in this district which have been based on substantially lower figures. Fourth, plaintiffs' failure to prevail on most of the claims asserted and the limited relief accorded require, according to defendants, that, under *Hensley*, the award must be "drastically reduced" below the amount plaintiffs request. Because of those defects in presentation by plaintiffs, defendants' position is that plaintiffs are entitled, on the record in these cases, to no award.

---

**6.** Plaintiffs' counsel in connection with the developments in this litigation since September 1, 1981, the date the motion to reopen *Vaughns* was filed, were not involved in *Vaughns* before March 13, 1975, the date this court closed the

court file in that case. There is no request pending before this court with regard to legal fees or costs for work performed prior to September 1, 1981.

"A request for attorney's fees should not result in a second major litigation." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941, 76 L.Ed.2d at 53. In the instant cases, the parties have submitted numerous legal memoranda and have thoroughly stated and supported their respective positions. Plaintiffs, given the opportunity so to do by this court, have supplemented some of the affidavits which they originally filed with more detailed descriptions of their activities.[7]

## II

■ The appropriate approach to use in determining when to award attorney's fees under 42 U.S.C. § 1988 and what the amount of the award should be was set forth by Justice Powell in *Hensley* and again more recently in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In *Hensley,* Justice Powell concluded that plaintiffs qualify as a "prevailing party" under 42 U.S.C. § 1988 and 28 U.S.C. § 1920 if plaintiffs "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit" and outlined the following approach for calculating fee awards:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C. Cir.1980) (en banc) (emphasis in original). 461 U.S. at 433–34, 103 S.Ct. at 1939, 76 L.Ed.2d at 50–51.[8] The product of reason-

---

**7.** *Neither side has asked for any evidentiary hearing.* Both sides have been given the opportunity, during a four-month period, to submit affidavits and other written factual materials. Neither side has requested discovery in connection with the pending fee and expense issues. Neither side has requested oral argument; nor does this court, mindful of Justice Powell's above-quoted words of caution in *Hensley,* see any need for the same, *see Hardman v. Board of Education of Dollarway,* 714 F.2d 823, 825 (8th Cir.1983); *Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 995–96 (E.D.N.Y.1983) (Weinstein, C.J.) and cases cited therein, although this court would have held a limited, time-controlled evidentiary hearing if either side had expressed a desire, and shown a need, for the same.

**8.** While Justice Powell's opinion was joined by only three other justices, none of the other justices disagreed with most of his approach. Chief Justice Burger's brief concurrence

stressed the burden borne by the fee applicant to "keep records in sufficient detail [so] that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed." 461 U.S. at 441, 103 S.Ct. at 1943, 76 L.Ed.2d at 55. Justice Brennan, along with three other justices, concurred in part and dissented in part, seemingly only differing with regard to certain emphases in Justice Powell's statement of the law. In dissenting, Justice Brennan was concerned that the plurality opinion would be misconstrued to support the proposition that the district courts should, in the absence of "exceptional success," end their inquiries "when they have multiplied a customary hourly rate times the reasonable number of hours expended, and then checked the product against the results obtained." 461 U.S. at 449, 103 S.Ct. at 1947, 76 L.Ed.2d at 60. Justice Brennan further wrote:

[T]he court's opinion should not be read to imply that "exceptional success" provides the

able hours times a reasonable rate is only one step in the fee determination process. In cases such as *Hensley* and the instant cases, in which a plaintiff prevails on only some of his claims, Justice Powell wrote that two additional questions must be addressed:

First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Id.* Claims are unrelated if "distinctly different" and "based on different facts and legal theories." Work on such claims, if unsuccessful, should not be compensated in fee awards. If, however, successful and unsuccessful claims arise from a "common core of facts" or are based on "related legal theories," it may be difficult to divide the hours spent on a claim-by-claim basis. In such circumstances, the district court's exercise of discretion should be guided by "the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." 461 U.S. at 435, 103 S.Ct. at 1940, 76 L.Ed.2d at 51–52. "Excellent results" may lead to full compensation; "exceptional success" may justify an enhanced award. However, in cases in which a plaintiff achieves only "partial or limited success," full compensation is excessive. In the latter situation, Justice Powell indicated that

there apparently is no single approach which must be followed:

The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

461 U.S. at 436–37, 103 S.Ct. at 1941, 76 L.Ed.2d at 52. The exercise by the trial court of such discretion should be accompanied by "a concise but clear explanation of [the district court's] reasons for the award." 461 U.S. at 437, 103 S.Ct. at 1941, 76 L.Ed.2d at 53. In addition, the district court should also in the exercise of its discretion apply the twelve factors in *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714, 717–19 (5th Cir.1974), to the extent those factors are not already subsumed in the analysis set forth above.[9] *See* 461 U.S. at 434 n. 9, 103 S.Ct. at 1940 n. 9, 76 L.Ed.2d at 51 n. 9. In *Hensley,* Justice Powell specifically noted (at 429, 103 S.Ct. at 1937, 76 L.Ed.2d at 48) the references, with approval, in the House and Senate reports relating to § 1988, to *Georgia Highway*'s twelve factors. In *Blum v. Stenson,* Justice Powell, writing for himself and six other members of the Court, held that a bonus over and above a reasonable fee, calculated by multiplying the reasonable number of hours of work by a reasonable fee set in accordance with prevailing market rates in the relevant community, is appropriate when "exceptional success," —— U.S. at ——, 104 S.Ct. at 1548

---

only basis for awarding a fee higher than the reasonable rate times the reasonable number of hours.... To the contrary, the Court expressly approves consideration of the full range of *Johnson v. Georgia Highway Express* factors.... If the rate used in calculating the fee does not already include some factor for risk or the time value of money, it ought to be enhanced by some percentage figure. By the same token, attorneys need not obtain "excellent" results to merit a fully compensatory fee ...; merely prevailing to some significant extent entitles them for full compensation for the work reasonably required to obtain relief....

*Id.* at n. 8 (citations to majority opinion omitted).

9. The twelve factors are:

(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3, 76 L.Ed.2d at 48 n. 3.

is obtained, but only to the extent that an "upward adjustment" is shown to be necessary "to provide fair and reasonable compensation." *Id.* at ——, 104 S.Ct. at 1550.[10]

### III

■ In the instant case, there are several threshold issues. To begin with, there can be little doubt that plaintiffs are "prevailing parties" in this litigation. Among other relief sought, plaintiffs requested in both *Vaughns* and *NAACP* a declaration that defendants had not achieved unitary status. Such relief was granted and is sufficient in the context of this case to qualify plaintiffs as prevailing parties. *See Tasby v. Wright*, 550 F.Supp. 262, 274 (N.D.Tex.1982) (a determination that vestiges of old dual system remain supports the conclusion that plaintiffs are "prevailing parties"). Another threshold question is posed by defendants' contention that various inadequacies of documentation and other failures by plaintiffs to follow the teachings of *Hensley* require denial to plaintiffs of any fee award. *See also,* in a pre-*Hensley* time frame, *Anderson v. Morris*, 658 F.2d 246 (4th Cir.1981) (Butzner, J.). Similar contentions were addressed in *Disabled in Action v. Mayor & City Council of Baltimore*, 685 F.2d 881, 886 (4th Cir.1982), in which Chief Judge Winter stated:

> [A]n item of a fee claim may not be refused in its entirety on the grounds

that it is excessive. Rather, the court should withhold fees in respect of such an item only to the extent of the excess, while granting a fee to the extent the item reflects time and effort reasonably expended by counsel.[11]

In much the same vein, Chief Judge Robinson outlined in *Jordan v. United States Department of Justice*, 691 F.2d 514, 518 (D.C.Cir.1982), the limited circumstances in which a total denial is appropriate:

> Total denial of requested fees as a purely prophylactic measure, however, is a stringent sanction, to be reserved only for the most severe of situations, and appropriately invoked only in very limited circumstances. Outright denial may be justified when the party seeking fees declines to proffer any substantiation in the form of affidavits, timesheets or the like, or when the application is grossly and intolerably exaggerated, or manifestly filed in bad faith.[12]

(Footnotes omitted). This case does not present one of those rare instances in which the deficiencies in plaintiffs' presentations provide an appropriate basis for denial of fees and expenses in their entirety. Rather, consideration of what reductions, if any, are required by those deficiencies is needed.

The last threshold question is whether or not plaintiffs' unsuccessful claims were related to the successful claims.[13] In that

---

**10.** Concurring, Justice Brennan, with whom Justice Marshall joined, stressed the need in given cases for "upward adjustments to compensate for the contingent nature of success, and thus for the risk of nonpayment in a particular case." —— U.S. ——, 104 S.Ct. at 1551.

**11.** *Disabled in Action* was a suit brought under the Rehabilitation Act. The attorney fee provision of that statute, 29 U.S.C. § 794a(b), was at issue, not 42 U.S.C. § 1988. In that case, however, Chief Judge Winter relied, in part, on *Bonnes v. Long*, 599 F.2d 1316 (4th Cir.1979) (Phillips, J.), a § 1988 case, stating that "the analytical considerations are the same under both statutes." 685 F.2d at 881 n. 4.

**12.** *Jordan* was a case brought under the fee provision of the Freedom of Information Act. In *Jordan* reference is made to *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980), a case

involving Title VII. That latter case was, in turn, cited and quoted from by Justice Powell in *Hensley* (at 51), which involved § 1988. For other cases to the same effect as *Disabled in Action* and *Jordan, see Action on Smoking and Health v. Civil Aeronautics Board*, 724 F.2d 211, 220 (D.C.Cir.1984) (Bazelon, J.) (citing to the above-quoted statements in *Jordan* ); *Pawlak v. Greenawalt*, 713 F.2d 972, 978 (3d Cir.1983) (Higginbotham, J.).

**13.** Seemingly, the case law suggests that the first step in a fee award determination should be to determine from the total of hours claimed by plaintiffs those which were "reasonably expended." In this litigation, however, due to the presence of a number of unsuccessful claims unrelated to successful claims, *see* the discussion *infra* in the body of this opinion, the culling out of hours devoted solely to such unsuccessful

regard, Justice Powell's comment in *Hensley* is to be noted: "We recognize that there is no certain method of determining when claims are 'related' or 'unrelated.' " [14] 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12, 76 L.Ed.2d at 53 n. 12. In this litigation, plaintiffs apparently concede that the claims advanced concerning faculty hiring, faculty assignments, student discipline, student classroom assignments, special education for the handicapped and for the talented and gifted were not related to their successful claims concerning unitary status and violations of outstanding orders or decrees of this court.[15] Plaintiffs, however, do seemingly contend that all time spent in the student assignment area is related to their successful claims.[16] That would include time devoted to the attempt to establish intentional discrimination in connection therewith.

A number of courts have wrestled with the problem of "related" and "unrelated" claims. Prior to the decision in *Hensley*, Judge McGowan wrote in *Copeland v. Marshall*, 641 F.2d 880, 892 n. 18 (D.C.Cir. 1980) (en banc):

> [I]t sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did

not prevail under one or more of these legal theories. No reduction in fee is appropriate where the "issue was all part and parcel of one matter," *Lamphere v. Brown Univ.*, 610 F.2d 46, 47 (1st Cir. 1979), but only when the claims asserted "are truly fractionable," *id.*

In a post-*Hensley* case, *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1984), plaintiffs successfully challenged the policy of the Chicago police department which called for strip searches of all women placed in local detention facilities. In contrast to that policy, males were subject to a strip search only if the police had reason to suspect that an individual was concealing weapons or contraband. One plaintiff also brought a claim based on an allegedly false arrest and based on excessive force allegedly used in connection with that arrest. Those latter claims were, however, unsuccessful. The district court excluded from the fee award all time spent in connection with those claims.

On appeal, Judge Wood upheld the trial judge's ruling, stating the test for determining "relatedness" as follows:

> We believe a useful tool for making this determination is to focus on whether the claims seek relief for essentially the same course of conduct. Under this analysis, an unsuccessful claim will be *un*related to a successful claim when

and unrelated claims will be first approached. The net result will in no way be affected by that process, but the time spent in analysis is reduced because the reasonableness of time spent in unrelated work is not considered.

plaintiffs were only partially successful if counsel's records do not provide a proper basis for determining how much time was spent on particular claims."). 461 U.S. at 437 n. 12, 103 S.Ct. at 1941 n. 12, 76 L.Ed.2d at 53 & n. 12.

**14.** Justice Powell also noted the need for the detailed documentation emphasized by Chief Justice Burger in his concurrence:

> The applicant ... should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.[12]
> [12]....Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures. See *Nadeau v. Helgemoe*, 581 F.2d 275, 279 ( [1st Cir.] 1978) ("As for the future, we would not view with sympathy any claim that a district court abused its discretion in awarding unreasonably low attorney's fees in a suit in which

**15.** Plaintiffs' position in that regard is inferred by this court from plaintiffs' initial fee application which excluded all time devoted exclusively to those unsuccessful areas and from the 27% reduction in the amended request, which appears to be a conscious effort by plaintiffs to estimate that proportion of time which cannot be specifically divided between unsuccessful claims unrelated to successful claims and successful claims.

**16.** Plaintiffs' position in that latter regard is inferred from their inclusion of all time devoted to the student school assignment area in their pending fee request.

the relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised.

723 F.2d at 1279 (emphasis in original). Under that test, the unsuccessful false arrest and excessive force claims were unrelated to the strip search claim. The unsuccessful claims "requested relief only from the two arresting officers, not from the City, for damages flowing from the conduct surrounding the arrest itself; the challenged conduct was that the arrest was undertaken without probable cause and was accomplished with excessive force." *Id.* at 1279-80. In contrast, the successful claim "challenged only the conduct relating to the search, namely, that the strip search was constitutionally unreasonable and discriminatory. Because the relief requested on the false arrest and excessive force claims corresponds to courses of conduct 'distinctly different'. from that relating to the strip search claim," hours devoted to those non-strip search claims were properly uncompensated. *Id.* at 1280.

In *Hensley* itself, plaintiffs challenged the constitutional sufficiency of defendants' treatment of the mentally ill at a state institution in six general areas which were: physical environment; individual treatment plans; least restrictive environment; visitation, telephone and mail privileges; seclusion and restraint; and staffing. Plaintiffs prevailed in connection with the first five areas but failed on the staffing claim. In commenting on the district court's fee award, Justice Powell stated:

Given the interrelated nature of the facts and legal theories in this case, the District Court did not err in refusing to apportion the fee award mechanically on the basis of respondents' success or failure on particular issues.

461 U.S. at 438, 103 S.Ct. at 1942, 76 L.Ed.2d at 53-54 (footnote omitted); *see also Mary Beth G.*, 723 F.2d at 1280 n. 17.

▮▮▮ Under the circumstances of the within litigation, the unsuccessful claims of plaintiffs which concerned areas besides the student school assignments claim are unrelated to the plaintiffs' successful claims. Those unsuccessful claims were presented separately from the latter. The witnesses who testified concerning them either touched not all or only slightly on the issue of student assignments to schools. For instance, the testimony of Dr. Marshall concerned only special education for the handicapped and for the talented and gifted.[17] Mr. George Brown testified only concerning discipline. Dr. Gordon Foster testified only concerning faculty assignments, classroom assignments and student discipline.[18] On the other hand, almost all of the witnesses who testified concerning the student assignment area did not go beyond that subject in their testimony.[19] While the time spent by plaintiffs' counsel in discovery does not seem to be as easily separable as time spent during trial, that appears to be caused by the inadequacy of plaintiffs' documentation, rather than by the inseparable nature of the different claims. Furthermore, the fact that time was spent in pretrial on procedural matters such as the motion to consolidate *Vaughns* and *NAACP*, or even the motion to reopen *Vaughns* which was relevant to all claims, does not mean that all pretrial work was related to successful claims. Such a conclusion would mean that all claims under the same procedural umbrella are necessar-

---

**17.** *See* Trial Transcript (Tr.) at 467-577.

**18.** Plaintiffs stated at trial that Dr. Foster's testimony would also touch on the student school assignment area but now appear to concede that his testimony was not relevant to that subject, *see* note 22, *infra.* A review of such testimony which is found at Tr. 395-465, 594-682 and 686-753 shows that plaintiffs' later statements reflected in note 22, *infra* are more accurate.

Mr. Brown's testimony is located at Tr. 997-1149.

**19.** Such witnesses included Mr. Lamson, Mr. Overton, Mr. Wendorf, Mr. Peterson, Mr. Grier, Dr. Feeney and Dr. Taeuber. The only witnesses whose testimony seems related to both student school attendance and other claims were Dr. Estep and Ms. Pruden, both of whom testified relatively briefly.

ily related even if some of them are claim-unrelated. Finally, the presence of some similarities between the legal theories which underlie all the claims in the instant litigation does not require the conclusion that all of the claims were related in the face of the factual severability of the various claims detailed above. *See Tasby v. Wright,* 550 F.Supp. at 274, in which plaintiffs who prevailed on a claim concerning failure to achieve unitary status with regard to student school assignments were not compensated for time spent on an unsuccessful attack with regard to student discipline.

With regard to the three different issues raised concerning student school assignments, *i.e.,* failure to achieve unitary status, violation of outstanding court orders or decrees and intentional discrimination, defendants argue that the time devoted to the latter should be eliminated despite plaintiffs' success in connection with the other two issues. Such an approach may well present relevant and material considerations in connection with the *amount* of the award for fees and expenses, when this court reaches, as it does *infra,* that issue in the light of the "results obtained," but does not support a wholesale deletion of all such time on the basis of "unrelatedness." Defendants contend that the finding of unitary status was a relatively straightforward task which required consideration of a fraction of the evidence necessary to reach a conclusion regarding intentional discrimination. This court does not agree. The determination of whether unitary status was achieved went far beyond mechanical analysis of the racial composition of each school in conjunction with the population statistics of the relevant area. In particular, the actions of some defendants in this litigation were considered in connection with determining whether they had "achieved the greatest degree of desegregation possible under the circumstances...." *Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425, 1435 (5th Cir.1983). In the instant litigation, the trial record indicates that the lengthy review of the changes in student attendance areas was, in part, directed at showing intentional discrimination. However, such a review was also relevant to, and was referred to, by this court in its opinion in connection with this court's conclusion as to unitary status.[20] The 1980 busing changes were particularly important in that regard.[21] It is true that with regard to certain other changes in student attendance areas, this court concluded that they did not violate any court order or decree or constitute intentional discrimination, and that this court also did not conclude that they themselves were part of the old dual system. But even if legal services performed by plaintiffs' counsel in presenting evidence to this court concerning violation of any court

---

20. *See Bridgeport Housing Authority Police v. City of Bridgeport,* 564 F.Supp. 2 (D.Conn.1983), in which plaintiffs contended that the City's failure to give them the same rights, status and benefits it gave to members of the municipal police force violated a number of statutes, namely, Title VII, 42 U.S.C. §§ 1981 and 1983, the Comprehensive Employment and Training Act (29 U.S.C. §§ 801–999) and the Model Cities Act (42 U.S.C. § 3301 *et seq.*). Plaintiffs prevailed only with respect to their claim under the Model Cities Act. Defendants contended that work done by plaintiffs' counsel concerning the other statutes was unrelated to the Model Cities Act claim and should go uncompensated. The Court rejected that argument concluding that the claims under each of the statutes concerned the same "practice or course of conduct." *Id.* at 8.

21. *See Vaughns,* 574 F.Supp. *supra* at 1337–55, 1360–71. Certain of the changes in school at-

tendance areas had no significant effect on racial balance. Those included changes pursuant to the secondary school reorganizations of 1980–81 and 1981–82, those pursuant to the opening of certain new schools and those which resulted from certain miscellaneous changes. Other changes by defendants, such as those pursuant to school closings or overcrowding, "reveal[ed] that defendants did less than could have been done to wipe out all of the pre-1973 segregation." 574 F.Supp. at 1332. The elementary school busing changes of 1980 which presented a clear violation of prior court orders also was the most significant of all changes with regard to school attendance areas in contributing towards "the resegregation of many predominantly black schools." *Id.* at 1354. All of those changes were explored in detail at trial and in the court's written opinion.

order or decree and/or intentional discrimination could be identified and separated from work done by plaintiffs' counsel with regard to the "vestiges" issue—a task which would be very difficult and perhaps impossible—all of that evidence was relevant and material to the "vestiges" issue.

Plaintiffs' original request for 6,055.3 hours purported to eliminate all hours which were solely spent on the unrelated, unsuccessful claims discussed above. The subsequent 27% reduction was designed further to eliminate time spent on such issues which were not easily isolated within plaintiffs' records. A review of plaintiffs' affidavits indicates that, for the most part, the 6,055.3 hour request did eliminate all hours *solely* devoted to unsuccessful, unrelated claims, but that there are a few items which appear to have been included as chargeable to successful claims which should not have been so included.[22] Accordingly, the following further reductions

22. In their Supplemental Memorandum in Support of Motion for an Award of Attorneys' Fees and Expenses, filed December 20, 1983, plaintiffs identify a number of witnesses "whose testimony related to issues on which plaintiffs did not prevail." Those witnesses were Marshall, Foster, Waynant, Brown, Pruden, Ives, Coombs, McMillen, Callahan, and Estep. However, in their affidavits, plaintiffs occasionally charge time spent during trial when those witnesses were testifying. Some of the reductions made *infra* are to correct such errors.

23. Plaintiffs apparently agree that all of the testimony of the witnesses listed in note 22, *supra*, related to unsuccessful issues. In addition, this court concludes that the testimony of Broadnax related only to faculty hiring. This court further determines, as discussed *supra,* that all of those unsuccessful issues were unrelated to the claims in connection with which plaintiffs succeeded.

The calculation of these reductions is based upon review of the trial transcript which shows approximately how much in-court time was devoted to witnesses whose testimony related solely to issues with regard to which plaintiffs did not prevail and upon review of plaintiffs' affidavits. Those reviews indicate whether time was properly or improperly attributed, in part or in whole, to plaintiffs' successful claims. The resulting reductions are approximations because precise accuracy to a high degree of certainty is just about impossible. In some instances that is because trial days have to be split between those

are appropriate in order to eliminate *all* time devoted *solely* to unsuccessful, unrelated claims:

### Attorneys

| | | | |
|---|---|---|---|
| Joseph M. Hassett | — | 80.5 | hours |
| John C. Keeney | — | 62.0 | hours |
| Carol A. Melton | — | 51.25 | hours |
| George H. Mernick, III | — | 32.0 | hours |
| Elliot C. Mincberg | — | 5.0 | hours |
| Nell Hoffman Bonaparte | — | 4.0 | hours |

### Paralegals

| | | | |
|---|---|---|---|
| Sharon Miller | — | 17.0 | hours |
| Jane Palmer | — | 6.0 | hours |
| Elizabeth Schreiner | — | 19.5 | hours |
| Ellen T. Smolka | — | 28.0 | hours |

The reductions made for time spent by attorneys reflect for the most part trial time apparently inaccurately attributed to plaintiffs' successful claims. Also, the reductions include some out-of-court time which was seemingly not correctly characterized.[23] The reductions with respect to

witnesses whose testimony related to successful claims and those witnesses whose testimony concerned only unsuccessful claims. In other instances, counsel's affidavits do not reveal precisely how much time in a trial day was devoted to successful claims and how much devoted to unsuccessful issues. Some of the reductions also reflect time spent during recesses or before or after the trial day. Without any detailed documentation from plaintiffs to the contrary, the court assumes that such time was spent in preparation for or post-analysis of the day's witnesses. On the whole this court believes that the reductions set forth below are accurate within a few hours and are, accordingly, a preferable alternative to general percentage reductions. The reductions made from time set forth in Mr. Hassett's affidavits are as follows:

5/4/82 - 2 hours for testimony of witness Foster, *see* Tr. at 395–465

5/5/82 - 11 hours for testimony of witnesses Marshall and Foster, *see* Tr. at 467–682

5/6/82 - 6 hours for testimony of witnesses Foster and Waynant, *see* Tr. at 686–753, 829–861

5/10/82 - 14 hours for testimony of witnesses Waynant and Brown, *see* Tr. at 863–1072

5/21/82 - 13 hours for testimony of witnesses Ives and Combs *see* Tr. at 2234–2442

5/11/82 - 5 hours for testimony of witness Brown, *see* Tr. at 1075–1149

6/1/82 - 1 hour for testimony of witness McMillen, *see* Tr. at 3749–70

6/8/82 - 8 hours for testimony of witness McMillen, *see* Tr. at 3774–3877

paralegal time consist primarily of time spent abstracting testimony of Broadnax

6/9/82 - 8 hours for testimony of witnesses Callahan and Broadnax *see* Tr. at 3879–3949, 3991–4049

6/10/82 - 10 hours for testimony of witness McMillen, *see* Tr. at 4059–4131

6/15/82 - 2.5 hours for testimony of witness Estep, *see* Tr. at 4142–4231

The reductions from Mr. Keeney's claims are as follows:

5/4/82 - 10 hours for trial preparation for witnesses Foster and Marshall and trial testimony of former

5/5/82 - 12 hours for trial testimony of witnesses Marshall and Foster and trial preparation for former

5/6/82 - 5 hours for trial testimony of witnesses Foster and Waynant

5/10/82 - 7 hours for trial testimony of witnesses Waynant and Brown and for preparation re Waynant

5/21/82 - 9.5 hours for trial testimony of witnesses Ives and Combs

6/1/82 - 3 hours for preparation for McMillen cross-examination and for McMillen trial testimony

6/9/82 - 9 hours for preparation for and trial testimony of witnesses Callahan, McKenney and Broadnax

6/10/82 - 6 hours for trial preparation for and trial testimony of witness McMillen

6/15/82 - 2.5 hours for trial testimony of witness Estep

(*See* Hassett reductions *supra* for references to pages in the trial transcript).

The reductions from Ms. Melton's claims are as follows:

5/4/82 - 10.5 hours for preparation for Marshall testimony.

5/5/82 - 9.5 hours for taking direct testimony of witness Marshall and for attendance at trial during testimony of witness Foster

5/6/82 - 7.5 hours for attendance at trial during testimony of witnesses Foster and Waynant and for preparation of cross-examination of Waynant

5/20/82 - .75 hours for conference concerning Callahan cross-examination

5/26/82 - 7 hours for preparation for Callahan cross-examination

5/28/82 - 3.5 hours for preparation for Callahan cross-examination

6/8/82 - 4.5 hours for preparation for Callahan cross-examination

6/9/82 - 8 hours for attendance at trial during testimony of witnesses Callahan, McKenney and Broadnax

(*See* Hassett reductions *supra* for references to pages in the trial transcript).

The reductions from Mr. Mernick's claims are as follows:

5/4/82 - 3 hours for attendance at trial during testimony of witness Foster

5/5/82 - 10 hours for attendance at trial during testimony of witnesses Foster and Marshall

and of witnesses named in note 22, *supra*.[24] The total time reduction is 305.25 hours

5/10/82 - 13 hours for attendance at trial during testimony of witnesses Waynant and Brown and for preparation of cross-examination of the latter

5/11/82 - 6 hours for attendance at trial during testimony of witness Brown

(*See* Hassett reductions *supra* for references to pages in the trial transcript).

The reductions from Mr. Mincberg's claims are as follows:

5/11/82 - 5 hours for attendance at trial during testimony of witness Brown

(*See* Hassett reductions *supra* for references to pages in the trial transcript).

The reductions from Ms. Bonaparte's claims are as follows:

5/6/82 - 4 hours for attendance at trial during testimony of witnesses Foster and Waynant

(*See* Hassett reductions *supra* for references to pages in the trial transcript).

24. The reductions for Sharon Miller are as follows:

5/18/82 - 2.5 hours abstracting testimony of witnesses Marshall and Foster

5/19/82 - 3.25 hours abstracting testimony of witnesses Marshall and Foster

5/21/82 - 2.5 hours abstracting testimony of witnesses Marshall and Foster

5/24/82 - 1.75 hours abstracting testimony of witnesses Marshall and Foster

5/25/82 - 0.75 hours abstracting testimony of witnesses Marshall and Foster

5/26/82 - 1.75 hours abstracting testimony of witness Brown

5/28/82 - 4.5 hours abstracting testimony of witness Brown

The reductions for Jane Palmer are as follows:

6/6/82 - 2 hours abstracting testimony of witness McMillen

6/7/82 - 3 hours abstracting testimony of witness McMillen

6/8/82 - 1 hour abstracting testimony of witness McMillen

The reductions for Elizabeth Schreiner are as follows:

5/20/82 - 4 hours for research re witness Callahan and for reading testimony of witnesses Foster and Marshall

5/21/82 - 5 hours for preparation re witness Callahan and for reading testimony of witnesses Waynant and Brown

5/24/82 - 4 hours for preparation re witness Callahan

6/9/82 - 6.5 hours for attendance at trial during testimony of witness Callahan

The reductions for Ellen T. Smolka are as follows:

7/9/82 - 6.5 hours abstracting testimony of witness Callahan

7/12/82 - 7 hours abstracting testimony of witness Callahan

which lowers plaintiffs' total gross hours to 5,750.05.

■ There remain a number of hours devoted by plaintiffs to unsuccessful, unrelated claims which are very difficult to separate. Plaintiffs' proposed across-the-board cut of 27% would appear to represent approximately what plaintiffs claim it to represent, *i.e.*, the percentage of trial transcript pages devoted to unsuccessful, unrelated claims. However, the percentage of trial transcript pages is, at best, only an approximate estimate of hours devoted to such issues outside of trial. Accordingly, the use of that approach might not be appropriate if the percentage of time devoted to such claims could be more accurately determined in another manner. Unfortunately, no more appropriate alternative has been suggested as available in the instant litigation.[25] Accordingly, the 27% figure is used herein as a *guideline* to determine further appropriate reductions for time spent on unsuccessful, unrelated claims. A review of plaintiffs' affidavits shows that

> 7/13/82 - 3 hours abstracting testimony of witness Callahan
> 7/15/82 - 6.25 hours abstracting testimony of witnesses Callahan and McKenney (some allowance is made for the small portion of the latter's testimony which related to unitary issues)
> 7/16/82 - 5.25 hours abstracting testimony of witnesses McKenney and Broadnax (a similar allowance as above has been made)
> 7/19/82 - 1 hour abstracting testimony of witness Broadnax
> 7/20/82 - 4.5 hours abstracting testimony of witness Broadnax
> The reductions for Mary T. Cynar are as follows:
> 6/9/82 - 7.5 hours for attendance at trial during testimony of witnesses Callahan, McKenney and Broadnax (some allowance has been made for that testimony of witness McKenney which related to unitary status).

**25.** Plaintiffs' affidavits provide in a number of instances no basis to divide time spent between issues. Some work which is listed as relevant to more than one claim is not allocated among the various claims.

**26.** The requests of Messrs. Hassett and Tatel are reduced for several reasons. First, the descrip-

based on that 27% *guideline,* the following reductions are appropriate:

### Attorneys

| | | |
|---|---|---|
| Joseph M. Hassett | — | 32% |
| David Tatel | — | 32% |
| Nell Hoffman Bonaparte | — | 17% |
| Elliot C. Mincberg | — | 17% |
| Carol A. Melton | — | 17% |
| David L. Lillenhaug | — | 17% |
| Patricia Brannan | — | 0% |
| All others | — | 27% |

### Law Clerks

| | | |
|---|---|---|
| Kenneth Pringle | — | 0% |
| Laurie Keenan | — | 0% |

### Paralegals

| | | |
|---|---|---|
| Mary T. Cynar | — | 27% |
| Freddie K. Rios | — | 27% |
| Martha Williams | — | 27% |
| All others | — | 0% |

■ On a rough justice basis, this court believes that the 27% reductions with regard to Messrs. Hassett and Tatel should be enhanced by 5% to 32%, largely because of inadequately detailed descriptions of work performed which make it difficult for this court to determine how much time was spent on particular issues.[26] As to the

tions are not entirely adequate. Both present numerous entries which are charged solely to successful claims but are only minimally described. A review of their affidavits shows many instances of "telcons,""review of pleadings," "telcons re expert witnesses," without more detailed descriptions. This Court requested additional detailed descriptions from both individuals, and the same were provided. However, they set forth only slightly more detailed descriptions of some of the entries than were originally submitted. Inadequate documentation can serve as a basis for reductions. *See Action on Smoking and Health v. Civil Aeronautics Board,* 724 F.2d 211, 220 (D.C.Cir.1984). It is also noted that both affidavits seem substantially in some instances to understate the time devoted to unsuccessful, unrelated claims. Mr. Hassett, the lead counsel in the instant litigation who was present at each and every day of trial, claims only five instances where *any* of his time was spent which was relevant to *any* of the unsuccessful, unrelated claims. Mr. Tatel states that none of his time was spent concerning such claims. However, the entries for December 8, 1981 and April 13, 15, 16, 19, 20, 23 and 27, 1982 of Mr. Tatel's supplemental submissions seemingly disclose that he spent more time on unsuccessful unrelated claims than his affidavits show.

above-listed persons other than Messrs. Hassett and Tatel, the 17% and 0% reductions are based upon information in affidavits submitted by plaintiffs which in adequate detail show that a relatively low portion of effort was spent on unsuccessful, unrelated claims.[27] In sum, the reductions yield new totals of 3,951.75 hours of attorney and law clerk time and 468.705 hours of paralegal time.

## IV

■ The above analyses disclose, as best this court can determine, the total amount of time devoted by counsel to plaintiffs' successful claims and to other claims related to those successful claims. The calculation of the number of such hours which were "reasonably expended" is the next step. A number of recent cases have detailed the proper approach to be taken by the district court in calculating "raw" or gross hours as distinguished from the number of hours "reasonably expended."[28] Those cases and others teach that a number of factors should be considered by the district court in the exercise of its discretion to eliminate hours found "excess, redundant or otherwise unnecessary." *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940, 76 L.Ed.2d at 51. Among those factors are the reasonableness of the number of hours devoted to a particular task, such as drafting a legal memorandum or abstracting a deposition. Other factors relate to duplication of effort,[29] overuse of discovery, *see Cuomo*, 574 F.Supp. at 999–1000, and conduct of the litigation as a whole from the point of view of a cost-conscious client.

■ Defendants contend that the total of 6,000 hours over a nine-month period is *per se* unreasonable and cite to a number

---

27. The figure for Ms. Melton takes into account the reductions previously made for the time which she spent concerning the talented and gifted issue which was apparently incorrectly included as relevant to unitary status. Other than those eliminated hours, Ms. Melton spent relatively few hours on unsuccessful issues. No reduction is made for Ms. Brannan whose time was devoted entirely to the fee application. Ms. Bonaparte's, Mr. Lillenhaug's and Mr. Mincberg's affidavits also show few hours devoted to unsuccessful issues. The 17% reduction made from their requests accounts for that proportion of time spent on unsuccessful issues as well as time seemingly spent on matters of importance to many areas but allotted only to successful issues. For instance, Ms. Lillenhaug devoted a number of hours to document production and to attendance at school board meetings which were charged only to "unitary" issues. Both law clerks claim hours only for issues which related to the question of unitary status. With the exception of the three paralegals for whom percentage reductions were made, time spent by paralegals on unsuccessful issues has been accounted for, either in plaintiffs' submissions themselves or in the reductions made by this court. *See* note 24, *supra*.

28. *See, e.g., Hensley*, 461 U.S. 433–34, 103 S.Ct. at 1939–40, 76 L.Ed.2d at 50–51; *Ramos v. Lamm*, 713 F.2d 546, 553–55 (10th Cir.1983); *New York State Association for Retarded Children v. Carey*, 711 F.2d 1136, 1145–47 (2d Cir.1983); *Copeland v. Marshall*, 641 F.2d 880, 891–92 (D.C.Cir.1980) (en banc); *Society for Good Will to Retarded Children v. Cuomo*, 574 F.Supp. 994, 999–1000 (E.D.N.Y.1983).

29. *See* Judge Logan's comment in *Ramos v. Lamm*, 713 F.2d 546, 554 n. 4 (10th Cir.1983):

[W]e think that the presence of more than two lawyers during trial or the presence of more than one lawyer at depositions and hearings must be justified to the court. No fees should be awarded for hours reported by lawyers or law clerks who are present at depositions, hearings, or trial for the purpose of being trained and who do not participate in or contribute to the proceedings.

In *New York State Association of Retarded Children v. Carey*, 711 F.2d 1136, 1146 (2d Cir.1983), Judge Newman wrote:

In assessing the extent of staffing and background research appropriate for a given case, a district court must be accorded ample discretion. Under section 1988, prevailing parties are not barred as a matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist. *See Seigal v. Merrick*, 619 F.2d 160, 164 (2d Cir.1980). Nor are counsel forbidden from receiving fees for background research. *See Ross v. Saltmarsh, supra*, 521 F.Supp. [753] at 757–59 [ (S.D.N.Y.1981) ]. Of course, a trial judge may decline to compensate hours spent by collaborating lawyers or may limit the hours allowed for specific tasks, but for the most part such decisions are best made by the district court on the basis of its own assessment of what is appropriate for the scope and complexity of the particular litigation.

of cases in which such totals have been amassed over a significantly longer period of time. From the insight which this court gained during the course of its contact with counsel during the pretrial and trial stages of this litigation, this court believes that, in the context of what plaintiffs attempted to prove, their expenditure of 6,000 hours, while excessive in a few respects discussed in detail *infra*, was not beyond the bounds of reason. Plaintiffs amassed and presented, in the student assignment area alone, almost ten years of data (1972–1981) concerning the operations of Prince George's County schools in conjunction with changing demographic patterns during that same period. The litigation posed difficult questions of law which have been subject to subtle shifts during recent years prior to trial. Somewhat novel issues were at the heart of the question of resumption of jurisdiction in *Vaughns*. Similarly, the question of unitary status, even though it is a frequent topic of litigation, presented a considerable legal challenge which required the mastery of a complex and not always easy-to-understand body of case law. The speed with which the cases went to trial, nine months after the motion to reopen was filed, meant that many of those difficult and complex legal and factual questions had to be addressed on a nearly simultaneous basis. In such circumstances, some excesses and inefficiencies were inevitable and do not form a proper basis for reductions. Furthermore, the assertion and reassertion of numerous objections and defenses by imaginative, vigorous and sometimes overzealous defense counsel prolonged and complicated all phases of this litigation. In that context, defendants' complaints about the excessive hours devoted by plaintiffs' counsel require a careful, balanced approach by this court.

Nevertheless, many of the objections of defendants possess merit. Even though plaintiffs did not, in general, in this court's opinion, overstaff the litigation, there were some instances of overstaffing and the like.[30] In addition, the time spent

---

**30.** Due to the complexity of the within litigation, it was not unreasonable for plaintiffs to have three or perhaps four attorneys in the courtroom for trial at given times, two to three attorneys present at hearings and two attorneys present for depositions, particularly since defendants, representing a governmental body and its board members, often did the same. For the most part, plaintiffs stayed within those limits but there were some exceptions. For example, with regard to May 3 and June 18, 1982, plaintiffs request compensation for trial time spent by six and five lawyers, respectively. In connection with hearings held on October 21 and 29, 1981, plaintiffs request compensation for the time of four lawyers. Plaintiffs sent four attorneys to the Feeney deposition on December 10, 1981 and three to another deposition of Feeney on January 8, 1982. Three lawyers appeared for plaintiffs at the Vaughns deposition on January 7, 1982. The record also shows that three lawyers for plaintiffs request compensation for telephone conferences concerning discovery held on November 17, 1981, December 7, 1981 and February 3, 1982.

Defendants cite as an example of overstaffing what occurred in connection with the Combs deposition on December 16, 1981. However, the relevant inquiry is not how many of plaintiffs' lawyers were present, but for how many compensation for such attendance is requested. Plaintiffs' affidavits reveal that only Mr. Keeney requests such compensation. Defendants first raised the issue of attendance at the Combs deposition in their Opposition to Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses. Construing defendants' contentions as an "attack on the personal integrity of fellow counsel," plaintiffs responded to those contentions in their Reply Memorandum. Defendants fired back in their Supplemental Opposition. Plaintiffs again responded in their Reply to Defendants' Supplemental Opposition which was entirely devoted to the subject of who attended the Combs deposition. Defendants also, in a submission entirely devoted to that issue, responded with an Answer to Plaintiffs' Reply to Defendants Supplemental Opposition. Plaintiffs fired another shot in this controversy with a Reply to Defendants' Answer. Defendants, evidently believing that this matter had been fully discussed in three rounds of briefs by the parties, allowed plaintiffs to have the last word and did not respond. What emerges is a total of duplicative and to a great extent unnecessary work with regard to the within fee expense issues. The above is only one example in which counsel on each side apparently goaded counsel on the other side into extra work. The record discloses that defendants must bear their share of the blame for the same and thus may not now meritoriously complain that all of plaintiffs' work in answering defendants' salvos was inappropriately expended.

Plaintiffs and defendants assigned many attorneys to work on this litigation during various

by plaintiffs' counsel in order to complete particular tasks appear in a few instances too great.[31] Not a small amount of time spent by counsel on both sides is attributable to lack of cooperation among them. During the pretrial phase this court repeatedly stated that both sides were guilty of repetitive and often petty objections and motions and that both sides overused the discovery process.[32] The plaintiffs must accept their share of responsibility for this unfortunate aspect of the within litigation and for the effect which it had. When all those facts are considered together, this court believes that a further 10% reduction in plaintiffs' request for law clerk and attorney time is appropriate. That of course is an approximation but it is the best this court can do.

of its stages. Five of plaintiffs' attorneys worked on the case for approximately twenty-five hours or less each. Five hours of familiarization time was spent by David A. Kikel whose total time on the litigation amounted only to 23 hours. Patricia Brannan, whose time spent on the litigation totaled only 16.75 hours, spent 3.5 hours reviewing the court's opinion. Yet that is not incomprehensible to anyone familiar with the management problems of a big law firm such as the one representing plaintiffs in this litigation.

31. Defendants point, *inter alia,* to the 288 hours spent by plaintiffs on the attorney fee motion. While the complexity and number of hours devoted to this litigation are such that that figure does not seem unreasonable, some 80–90 hours of that time were spent preparing a memorandum of law concerning attorneys' fees. That amount of time to prepare the particular memorandum of law does seem somewhat high. Another example pointed to by defendants with perhaps some merit is the 54 hours spent drafting a response to defendants' Fed.R.Civ.P. 19 motion.

32. Examples of the type of disputes which prolonged and complicated this litigation are found in the telephone conferences of December 29 and 30, 1981. On those two days, counsel, in the midst of depositions, were unable to resolve their differences over the propriety of a question posed by one of defense counsel to one of plaintiffs. The court's reaction at the time also sums up its attitude now:

> The problem is, Mr. Scanlan, that you went much too far, and maybe he went much too far in terms of his position, and if you all would have taken a walk out in the air for a minute and talked to one another, I think you could have solved this.

As to the paralegals, much of the time spent by them was devoted to abstracting testimony. A review of the submissions shows that plaintiffs' paralegals took up to 27 hours to abstract a single day's testimony—a transcript of some 200 pages. Even given the complex and statistical nature of some of the testimony, that would appear somewhat overdone. An allowance of 10 hours per day for abstracting transcripts would seem a reasonable figure and results in the following reductions:

| | |
|---|---|
| Barbara G. Watts | – 19.25 hours |
| Shirley Jarrett | – 36.00 hours |
| Abigail MacKenzie | – 17.00 hours |
| Sharon Miller | – 10.00 hours |
| Jane Palmer | – 10.50 hours |
| Deborah Trent | – 6.50 hours [33] |

> I do not mind being interrupted. That does not bother me. What bothers me, and I repeat, what bothers me is what I really think is the unjustified amount of time that is being spent by both sides in terms of these matters, and I will tell both sides that I have gone about as far as I am going to go—I am repeating but you said you may not have heard something on the telephone before—I have gone about as far as I am going to go with allowing this kind of uncontrolled discovery because I really think it is getting out of hand.

Transcript of proceeding held December 29, 1981 at 12. The court's comments during proceedings held on November 17, 1981 (at 17) and on February 3, 1982 (at 35) are also illustrative in that regard.

33. Ms. Watts during the period from June 24, 1982 to July 16, 1982 took 39.25 hours to abstract the testimony of June 1, 1982 and June 16, 1982, a total of 413 pages of testimony. Ms. Jarrett does not set forth which days of trial transcripts she abstracted but does state that she spent a total of 72 hours abstracting trial transcripts. Because of the great number of hours similarly spent by all of the other Hogan & Hartson paralegals and because of the failure to present adequate documentation concerning Ms. Jarrett's work, a 50% reduction has been deemed by this court to be warranted. Ms. MacKenzie spent 27 hours from June 3, 1982 to June 14, 1982 abstracting the testimony of a single day's testimony, May 17, 1982, involving some 164 pages of transcript. Ms. Miller, from July 7, 1982 to August 3, 1982, spent 20 hours abstracting the testimony of May 25, 1982 involving some 192 pages of testimony. Ms. Palmer spent 30.5 hours, from June 8, 1982 to July 23, 1982, abstracting the testimony of two days of trial, May 28, 1982 and June 15, 1982,

Those reductions result in totals of 3,556.58 hours of attorney and law clerk time and 369.45 hours of paralegal time reasonably expended on successful and related claims in the instant case.[34]

V

 The calculation of a reasonable hourly rate under 42 U.S.C. § 1988 requires reference to "market rates in the relevant community" which are "in line with those prevailing in [that] community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum,* —— U.S. at —— & n. 11, 104 S.Ct. at 1547 & n. 11. For litigation which does not stretch back more than three years, the use of current rather than historic rates is appropriate. *Carey,* 711 F.2d at 1152–53; *see also Ramos,* 713 F.2d at 555. A convenient and logical starting place for the court is the hourly rate normally charged by the applicant. *Zeffiro v. First Pennsylvania Bank, N.A.,* 574 F.Supp. 443, 447 (E.D.Pa.1983); *see also Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 at 24–25 (D.C.Cir.1984). The court may look to awards made in other civil rights litigation but such rates are not binding since the trial court "must rewrite"

the application of the appropriate factors with an eye to "the facts of each case." *Jones v. Amalgamated Warbasse Houses,* 721 F.2d 881, 885 (2d Cir.1983). The court may also draw upon its own knowledge of fees in the relevant area. *See Wojtkowski v. Cade,* 725 F.2d 127, 131 (1st Cir.1984) (Campbell, C.J.) Courts have seemingly considered, but not zeroed in too sharply upon, the question of whether the prevailing rate should be determined with reference to the forum or to the normal locale of the applicant's practice. *See Ramos,* 713 F.2d at 555; *McKenna v. Peekskill Housing Authority,* 573 F.Supp. 976, 980 (S.D. N.Y.1983). Adjustments can be made to account for lawyers who are practicing outside of their speciality. *See Ramos,* 713 F.2d at 555; *Capozzi v. City of Albany,* 565 F.Supp. 771, 775 (S.D.N.Y.1983).

Plaintiffs' request hourly rates ranging from $70–$175 per hour for attorneys, $40–$60 per hour for law clerks and $35–$50 per hour for paralegals. The rates requested with certain exceptions reflect those charged to Hogan & Hartson's clients as of August 31, 1983.[35] The following chart is a useful background reference for the rate determinations in this case:

### Attorneys

| Name | Date Graduated | Date Joined Hogan & Hartson | Requested Rate/Hour | Prior Civil Rights Experience |
|---|---|---|---|---|
| Bonaparte | 1981 | 1981 | $ 75 | No |
| Brannan | 1979 | 1980 | 95 | No |
| Hanifin | 1981 | 1981 | 75 | Limited |
| Hassett | 1967 | 1970 | 155 | No |
| Keeney | 1976 | 1978 | 110 | Yes |
| Kikel | 1978 | 1978 | 100 | No |

involving some 456 pages of testimony. Ms. Trent's figures show 14.5 hours between June 8, 1982 and June 11, 1982 abstracting a deposition held on May 26, 1982.

34. In making the reductions discussed in parts III and IV of this opinion, care has been taken by this court to avoid, to the fullest extent possible, cutting the same hours twice.

35. Rates requested for those attorneys no longer with Hogan & Hartson are those which were in effect on the last day of such attorney's employment with the firm. The rates requested by Messrs. Taylor and Chachkin, who are not formally affiliated with Hogan & Hartson, are not based on the rates charged by that law firm.

| | Date | Attorneys<br>Date Joined | Requested | Prior Civil |
|---|---|---|---|---|
| Name | Graduated | Hogan & Hartson | Rate/Hour | Rights Experience |
| Leavy | 1981 | 1981 | $70 | Limited |
| Lillehaug | 1979 | 1981 | 90 | No |
| Melton | 1981 | 1981 | 70 | No |
| Mernick | 1979 | 1980 | 95 | No |
| Mincberg | 1977 | 1977 | 105 | Yes, incl. school desegregation litigation |
| Rotman | 1979 | 1979 | 85 | No |
| Tatel | 1966 | 1974/1979* | 155 | Extensive, incl. school desegregation litigation |
| Taylor | 1955 | —— | 175 | Extensive, incl. school desegregation litigation |
| Chachkin | 1967 | —— | 150 | Extensive, incl. school desegregation litigation |

\* Mr. Tatel was not with Hogan & Hartson continuously during this period.

In judging the reasonableness of the requested rates, this court notes a recent survey of the billing rates of Baltimore's 25 largest law firms.[36] Of the 18 firms which disclosed their hourly rates, the range for the lowest associate was generally in the 55–65 dollar range while that for senior partners was generally in the 100–150 dollar range. This court is aware, however, that rates in the Washington, D.C. area in which Hogan & Hartson is located are usually higher than those charged in Baltimore. Because many parts of Prince George's County are closer to Washington, D.C. than to Baltimore where this court sits and because all of the other parts of that county are just about as close to Washington as to Baltimore, both the Washington and Baltimore rates will be taken into account herein.

The rates requested for Messrs. Taylor and Chachkin must be considered in the light of their expertise and experience in school desegregation litigation. Given Mr. Taylor's 30 years of experience, his stature in the field of civil rights law and his substantial accomplishments, all of which are detailed in his submission in support of his request for a fee award, the figure of $175 per hour is reasonable under Washington, D.C. standards and beyond the top of the range—though not too far beyond—the Baltimore standards. Mr. Chachkin's experience, while of more recent beginnings, is similarly impressive in quality and breadth and warrants the requested figure of $150 per hour in light of the figures contained in the Baltimore survey and charged in the Washington, D.C. area. In light of those conclusions, the court believes it appropriate to reduce Mr. Tatel's award to $145 per hour. His qualifications and experience in the civil rights field are extensive but lack the breadth of those of Messrs. Chachkin and Taylor. Mr.

36. *Baltimore's 25 Largest Law Firms,* Baltimore Business Journal, pp. 18–19, January 23–29, 1984.

Hassett's lack of experience in either the civil rights area, in general or in the school desegregation area in particular, indicate that a reduction to $130 per hour is warranted.[37] However, this court's allocation of a figure as high as $130 per hour reflects its high opinion of the quality of Mr. Hassett's performance during the instant litigation. It is true that neither plaintiffs' counsel nor plaintiffs' experts fully developed all of the possible facts and factors before and during trial. If such investigation had earlier taken place, it may well be that certain of the work which has been and presently is being undertaken by the staff of defendants and by court-appointed experts would have been earlier performed. However, this does not detract from the relief which plaintiffs in fact obtained and which is discussed, analyzed and weighed in other parts of this opinion. In addition, the quality of the work performed is taken into account in parts IV and V. Further, in litigation as difficult as the instant cases, any counsel for plaintiffs who were at all cost-conscious would necessarily have weighed the extent to which they and their experts would explore before and during trial each and every possible item which might lead to developments in support of their contentions.

Mr. Keeney's and Mr. Mincberg's prior civil rights experience, along with the major role which both played during this litigation and the skill which each of them displayed, indicate that no adjustments need be made in their requested rates. Mr. Mernick also had substantial responsibilities at trial but his lower experience level both in general and in the civil rights field in particular indicate that an $85 per hour rate is appropriate. Ms. Melton was given a level of responsibility which perhaps exceeded that normally accorded a first-year associate. Her activities included direct trial examination of Dr. Marshall concerning

the talented and gifted issue. No adjustment is made in her request for $70 per hour.

None of the other Hogan & Hartson attorneys played a major role in the litigation. A number, Ms. Leavy, Ms. Bonaparte, Ms. Brannan, Mr. White and Mr. Rotman, had no active in-court or deposition time but were largely engaged in legal research. Appropriate rates, considering their respective levels of experience, are as follows:

| | |
|---|---|
| Leavy | – $60 per hour |
| Bonaparte | – $65 per hour |
| Brannan | – $75 per hour [38] |
| Rotman | – $70 per hour |
| Lillenhaug | – $75 per hour |

■ The rest of the Hogan & Hartson lawyers involved in the case spent a substantial proportion of their hours doing document work. Such work is often better left for paralegals and should be compensated at a reduced rate regardless of the experience level of the attorney:

| | | |
|---|---|---|
| Hanifin | — | $55 per hour |
| Kikel | — | $55 per hour |

To recapitulate, the approved hourly rates are as follows:

| | | |
|---|---|---|
| Bonaparte | — | $ 65 per hour |
| Brannan | — | $ 75 per hour |
| Chachkin | — | $150 per hour |
| Hanifin | — | $ 55 per hour |
| Hassett | — | $130 per hour |
| Keeney | — | $110 per hour |
| Kikel | — | $ 55 per hour |
| Leavy | — | $ 60 per hour |
| Lillenhaug | — | $ 75 per hour |
| Melton | — | $ 70 per hour |
| Mernick | — | $ 85 per hour |
| Mincberg | — | $105 per hour |
| Rotman | — | $ 70 per hour |
| Tatel | — | $145 per hour |
| Taylor | — | $175 per hour |

**37.** Had Mr. Hassett, for instance, had greater civil rights experience, he might not have had to have consulted more experienced lawyers such as Mr. Tatel, Mr. Taylor or Mr. Chachkin to the extent he did.

**38.** Ms. Brannan was the associate in charge of preparing the fee application. Had she had prior civil rights experience it is likely that she would have been able to perform this task in less time.

As to the two law clerks who engaged in legal research, plaintiffs request rates of $40 and $60 per hour. In line with the above-described reductions, the latter is reduced to $50 per hour while the former is unchanged.

■ Plaintiffs seek reimbursement for paralegal hours at the rates of $35–$50 per hour. Paralegal rates have varied in the cases known to this court. For instance, in *Chisholm v. United States Postal Service,* 570 F.Supp. 1044, 1051 (W.D.N.C.1983), rates of $20 and $25 per hour were approved. In *Laffey v. Northwest Airlines,* 572 F.Supp. 354, 386 n. 74 (D.D.C.1983), *rev'd on other grounds,* 746 F.2d 4 (D.C. Cir.1984), the parties agreed upon a paralegal rate of $30 per hour. In *Richardson v. Byrd,* 709 F.2d 1016, 1023 (5th Cir.1983), there was an award of $30–$50 per hour but the work done by the paralegals in that case appears to have been more sophisticated than that performed by plaintiffs' paralegals in the instant case. Nevertheless, all of plaintiffs' paralegals have four-year undergraduate degrees. Many also have paralegal training, prior paralegal experience and/or a number of years of work with Hogan & Hartson. However, due to the nature of the bulk of the work which they performed, *i.e.,* organizing exhibits, abstracting testimony, this court believes that a $5 per hour reduction in all rates requested is appropriate.

Applying the above hourly rates to the hours reasonably expended, the following totals result:

| | | |
|---|---|---|
| Attorneys and law clerks | – | $355,019.00 |
| Paralegals | – | 12,474.00 |
| Total | | $367,493.00 [39] |

This is the so-called "lodestar" which may be decreased or increased according to those remaining *Georgia Highway* factors which have not already been considered

explicitly or implicitly in this court's above-set-forth analysis and then further adjusted according to the requirements of *Hensley* to account for the "results obtained."

## VI

The twelve factors set forth in *Georgia Highway,* 488 F.2d at 717–19, were adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), and by the Supreme Court in *Hensley.*[40] Many of those factors have already been subsumed in the analysis in prior portions of this opinion. Specifically, factors 1–3, 5, 7 and 9 have been fully considered *supra.*[41] With regard to factor 4, plaintiffs' counsel make no contention that any employment was precluded due to their work on these cases and make no request for any increase on this basis. Accordingly, this court finds no such increase necessary. *See Tasby,* 550 F.Supp. at 276.

With regard to factor 6, "whether the fee is fixed or contingent," the trial court in *Blum* allowed for an enhancement because the "issues presented were novel and the undertaking therefore risky." —— U.S. at ——, 104 S.Ct. at 1550, *quoting* 512 F.Supp. 680, 685 (S.D.N.Y.1981). The Supreme Court reversed the enhancement on the basis of risk due to the failure of the trial court to set forth in detail the factual basis of its action as well as the lack of any supporting materials submitted by plaintiffs:

> Absent any claim in the affidavits or briefs submitted in support of respondents' fee request, seeking such an adjustment, we cannot be sure what prompted the court's statement. Nowhere in the affidavits submitted in support of respondents' fee request, nor in their brief to the District Court, did respondents identify any risks associated

---

**39.** The totals have been rounded to the nearest dollar.

**40.** *See* note 9, *supra; see also Arnold v. Burger King Corp.,* 719 F.2d 63, 67 (4th Cir.1983).

**41.** In *Blum,* the Supreme Court stated that factor 2, the novelty and difficulty of the questions, should be considered in calculating the "lodestar" and is not a basis for a separate enhancement of the fee. —— U.S. at ——, 104 S.Ct. at 1547.

with the litigation or claim that the risk of nonpayment required an upward adjustment to provide a reasonable fee. On this record, therefore, any upward adjustment for the contingent nature of the litigation was unjustified.

— U.S. at ——, 104 S.Ct. at 1550 (footnote omitted). Justice Powell, however, in a footnote to the above passage, stated that the court did not reach in *Blum* the question of "[w]hether the risk of not being the prevailing party in a § 1983 case, and therefore not being entitled to an award of attorney's fees from one's adversary, may ever justify an upward fee adjustment." *Id.* at —— n. 17, 104 S.Ct. at 1550 n. 17.

While no court, to this court's knowledge, has, since *Blum*, ruled that upward adjustments of the lodestar to account for the risk of not prevailing in a § 1983 action constitute error as a matter of law,[42] there are instances of differences in approach in both pre- and post-*Blum* cases, as to when such an adjustment is appropriate. In *Ramos*, a pre-*Blum* decision, Judge Logan wrote:

> The contingency factor as a basis for enhancement also must be viewed with caution. Some courts appear to give a multiplier or bonus simply because the lawyers would have received nothing had they not won and some chance of losing always exists. The court should first determine, by requiring the party to reveal the fee arrangement, whether the lawyers really would have recovered fees

only if they prevailed or whether the client would have paid some fee regardless of the outcome. Lawyers who are to be paid whether they win or lose have a weak claim to a multiplier based on the risk of loss. Second, when the court has decided to award fees for hours spent on theories a plaintiff has pressed unsuccessfully, in a sense it is giving something of a contingency bonus and should remember that when contemplating a multiplier or additional bonus. Third, when determining whether to give a contingency bonus, the trial court should view the litigation as it reasonably should have appeared to the lawyers at the outset of the litigation.

713 F.2d at 558 (footnote omitted). In an earlier pre-*Blum* decision, the D.C. Circuit stated:

> An adjustment in the lodestar ... may be appropriate to compensate for the risk that the lawsuit would be unsuccessful and that no fee at all would be obtained.

. . . . .

> To the extent, of course, that an hourly rate underlying the "lodestar" fee itself comprehends an allowance for the contingent nature of the availability of fees in Title VII litigation against the Government, no further adjustment duplicating that allowance will be made. The district judge has ample powers of inquiry into the makeup of hourly rates to assure that the Government will not suffer from

---

**42.** A number of post-*Blum* decisions have declined to award or approve risk enhancements without stating that they are unavailable as a matter of law under § 1983. *See Laffey,* at 26–29; *Murray v. Weinberger,* 741 F.2d 1423, 1430–32 (D.C.Cir.1984); *Willie M. v. Hunt,* 732 F.2d 383, 387 (4th Cir.1984) (Winter, C.J.); *Inmates of Maine State Prison v. Zitnay,* 590 F.Supp. 979 at 987 (D.Me.1984); *Rank v. Balshy,* 590 F.Supp. 787, 799–800 (M.D.Pa.1984); *May v. Cooperman,* 582 F.Supp. 1458, 1462–63 (D.N.J. 1984). Other post-*Blum* cases have awarded risk enhancements. *See Palmer v. Shultz,* 594 F.Supp. 433 at 440–441 (D.D.C.1984); *Coleman v. Block,* 589 F.Supp. 1411 at 1421–22 (D.N.D. 1984); *Merkel v. Scovill, Inc.,* 590 F.Supp. 529 at 535–537 (S.D.Ohio 1984); *Redic v. Gary H. Watts Realty Co.,* 586 F.Supp. 699, 703–04 (W.D. N.C.1984). *See also Dickerson v. City Bank &*

*Trust Co.,* 590 F.Supp. 714, 717 (D.Kan.1984). As to pre-*Blum* decisions not discussed in this body of this opinion, *see, e.g., Northcross v. Board of Education of the Memphis City Schools,* 611 F.2d 624, 638 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 624 (4th Cir.1978) (*see, on remand,* 88 F.R.D. 27, 31 (M.D.N.C.1980)); *Tikalsky v. City of Chicago,* 585 F.Supp. 813, 816 (N.D.Ill.1984); *Grendel's Den, Inc. v. Larkin,* 582 F.Supp. 1220, 1229 (D.Mass.1984); *Wabasha v. Solem,* 580 F.Supp. 448, 463 (D.S.D.1984); *High v. Economics Laboratory, Inc.,* 576 F.Supp. 1365, 1367–68 (W.D.N.C.1983); *Chisholm v. United States Postal Service,* 570 F.Supp. 1044, 1048–50 (W.D.N.C.1983); *Tasby,* 550 F.Supp. at 262; *Espinoza v. Hillwood Square Mutual Association,* 532 F.Supp. 440, 450–51 (E.D.Va.1982).

any such duplication or, indeed, from any excessive allowance for this purpose. *Copeland*, 641 F.2d at 892–93.

More recently, in *Craik v. Minnesota State University Board*, 738 F.2d 348, 350–51 (8th Cir.1984), decided after *Blum*, the Eighth Circuit, in a per curiam opinion, awarded a 25% risk adjustment in connection with fees for appellate work, with this explanation:

> Plaintiffs in turn ask for an enhancement of their fee. The Supreme Court's recent opinion in *Blum v. Stenson*, — U.S. —, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), furnishes guidance on how to evaluate this claim. We know from *Blum* that the results obtained by plaintiffs are usually not a proper ground for enhancement. *Id.* 104 S.Ct. at 1541–42. On the other hand, *Blum* leaves open the possibility that the risks assumed by counsel in taking a case can be a ground for enhancement, *id.* at 1542 & n. 17, and we believe that this ground is available here. In *Blum* no enhancement on account of risk was allowed, because the District Court ... had no basis in the record for finding that any particular risk had been assumed. Here, however, such a finding is compelled. Counsel for the plaintiffs undertook this case, which they must have known would require a massive expenditure of time and energy, in the face of the very real possibility that no fee at all would be obtained. The risk here went beyond the normal contingent-fee situation. In Mr. Quiggle's case, for example, substantially all of his professional time between December 1982 and June 1983 was spent on this appeal. The investment of that much time out of one's law practice with no real hope of compensation if the appeal should prove unsuccessful is indeed a major risk, one that we think should be taken into account in setting a reasonable fee. In our opinion, an enhancement of 25 per cent. for the time spent by Messrs. Quiggle and Sommerville is appropriate. Each of them devoted a major amount of time to this case for a considerable period; Mr. Quiggle spent 689 hours, and Mr. (now Judge) Sommerville spent 484 hours. No enhancement will be allowed for Mr. Walker's and Mr. Gordon's time, because the hours expended by them, 14.9 hours and 15.8 hours respectively, were not sufficiently great to represent any significant risk.

In a decision filed recently, Judge Wilkey applied " '[t]he principle that only rare and exceptional circumstances can justify an upward adjustment of the lodestar' to an enhancement made to reflect 'the contingency of payment due to the risk of losing on the merits.' " *Laffey*, at 28 (footnotes omitted). In dissent, Judge Wright stated that "[t]he 'exceptional cases' test fashioned by the majority ... finds no support in the prior decisions of the Supreme Court." *Id.* dissenting op. at 38 (footnote omitted). Judge Wright, however, mirrored the view expressed by Judge Logan in *Ramos* that contingency adjustments not be made when the risk premium has been accounted for in the determination of the lodestar. *See id.* Beyond that concern for "double counting," Judge Wright stated that contingency adjustments followed the intent of Congress:

> Provided only that the lodestar figure does not already subsume the risk of non-success, whether [the odds of success] may be deemed "exceptional" is irrelevant in calculating the contingency adjustment. Congress made a deliberate judgment to encourage litigants to press claims for violation of civil rights even where the chances of success are uncertain. The legislative decision to permit courts to make adjustments to compensate for the risk of not prevailing reflects the "experience of the marketplace that lawyers generally will not provide legal representation unless they receive a premium for taking that risk."

*Id.* at 38–39 (footnotes omitted).

In the within litigation, plaintiffs' counsel have not received any compensation for their services and will receive only such sums as this court awards other than reimbursement of out-of-pocket costs. Further-

more, under the second prong of Judge Logan's analysis in *Ramos*, and pursuant to the approach stated by Judge Wright in *Laffey*, separate and distinct deductions have been made in part III of this opinion to account for time spent on issues other than student assignments to schools. Separate and distinct deductions will be made in part VII of this opinion to reflect, *inter alia*, time spent with regard to the claim of intentional discrimination in student assignments to schools. In addition, the determination of hourly rates has not been affected by the contingency factor. Accordingly, the calculation of the lodestar in this case has not included any adjustment for the risk of not prevailing.

While the prospects of success in this litigation, when viewed from hindsight, may appear high, particularly with regard to the claim of violation of outstanding court orders and decrees, at the time the suit was filed such prospects were not certain.[43] When the suit was instituted, repetitive emphasis placed by counsel for defendants upon the impropriety of resumption of jurisdiction by this court, which threatened any and all relief, had to be coped with by plaintiffs' counsel and addressed by this court. In the face of such uncertain prospects, plaintiffs' counsel committed the substantial resources of their firm in a massive effort. In preparing this opinion, this court has had occasion to review numerous other cases involving attorney's fee issues. In none of those cases has this court noted such an intensive effort by the prevailing party over such a short period of time. In the within litigation, plaintiffs' counsel committed over 6,000 hours of time over a period of approximately ten months. The commitment of hundreds of thousands of dollars of time, not over the course of many years, as is frequently the case, but over the course of less than a year, constitutes, in this court's opinion, an "exceptional" circumstance in the context of the risk involved. Thus, herein, this court need not choose between the differing views of the majority and dissenting opinions in *Laffey*.

 Because plaintiffs had not specifically requested enhancement of fee in the light of factor 6 in *Georgia Highway*, this court addressed a memorandum to counsel on October 17, 1984 affording to plaintiffs the opportunity to present further submissions in connection with that factor and also giving to defendants the opportunity to respond to any such submissions by plaintiffs.[44] As indicated in that memoran-

---

**43.** As to whether the 1980 busing changes presented clear instances of violations of court orders with regard to which plaintiffs were almost certain to prevail, it must be kept in mind that the equally clear violations of court orders in the area of faculty hiring did not lead to any relief. *See supra* note 4. In addition, it is questionable whether plaintiffs' counsel could have been fully aware of the entire factual context relating to unitary status and of all details of the 1980 busing changes before discovery and, perhaps also, trial took place.

**44.** The memorandum reads as follows:
October 17, 1984
MEMORANDUM TO COUNSEL *RE SYLVESTER J. VAUGHNS, JR., ETC., ET AL. V. BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY*, ET AL.—CIVIL NO. 72–325-K AND *NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, ET AL. V. BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY*, ET AL.—CIVIL NO. K–81–2597
This Court has determined that certain substantial reductions to plaintiff's requested fee and expense claims are appropriate. In fairness, however, plaintiffs may, perhaps, be entitled to some enhancement in connection with whether their fee arrangements are fixed or contingent. *See* factor 6 in *Georgia Highway*.
This Court's opinion with regard to plaintiff's fee and expense claims is ready to file except in one respect, *i.e.* plaintiffs have not requested, (or specifically stated, without a request, detailed reasons in support of), an upward adjustment based on said factor 6. *See Blum v. Stenson*, 52 U.S.L.W. 4377 [—— U.S. ——, 104 S.Ct. 1541, 79 L.Ed. 891] (U.S. March 21, 1984). Although this Court tentatively is of the view that the record contains sufficient basis for this Court to grant an enhancement to plaintiff's requested fee and expense claims in the light of said factor 6, this Court will not grant the same without a specific request and a detailed supporting presentation by plaintiffs. However, this Court hereby affords to plaintiffs the opportunity to present further submissions in that regard on or before October 29, 1984, or, if possible, on or before October 24, 1984. Defendants will

---

dum, because this court expected to provide in this opinion for a number of significant reductions in plaintiffs' fee and expense claims, this court believed that it was only fair to give plaintiffs the specific opportunity to address themselves to factor 6 in *Georgia Highway*.[45] In response, plaintiffs have asked for a one-third enhancement. Defendants, opposing any enhancement of fees because of the contingent-risk factor, have pointed to this court's conclusion in its June 20, 1983 opinion that plaintiffs failed to establish intentional discrimination on the part of defendants. In part III of this opinion, this court has reduced plaintiffs' fee request because of lack of success on the part of plaintiffs in connection with certain contentions. Additionally, in part VII hereof, this court is further reducing plaintiffs' fee request because of certain other lack of success, including plaintiffs' lack of success with respect to allegations of intentional discrimination. Defendants also contend that plaintiffs, in certain instances, did not adequately investigate and present evidence in support of certain of plaintiffs' contentions. That contention has been addressed in part V of this opinion.

■ Under all of the circumstances and for the reasons set forth in this part VI, this court concludes that an increase of 7–½% is appropriate in order to take into account the risk of failure at the outset of the reopening of this litigation in 1981 which faced plaintiffs' counsel who were,

insofar as fees were concerned, proceeding totally on a contingency basis. While this court has, in determining the hourly rates arrived at in part V, included adjustments for delays in payment, as Judge Newman wrote in *Carey*, 711 F.2d at 1152–53, that is not "an allowance for the contingent nature of the availability of fees." *See also Copeland*, 641 F.2d at 893. It is to be noted also that plaintiffs' failure to request a contingency enhancement was in the context of a request for some $460,000 in fees and that even with the 7–½% enhancement this court's award is still below that figure. The 7–½% enhancement is, in this court's judgment, a conservative increase and one which keeps well in mind the cautionary instructions stated by Justice Powell in *Blum*.

With regard to factors 10, 11 and 12, this court concludes that no further adjustments are required. While this case did engender some public controversy, this court does not believe that it stigmatized plaintiffs' counsel so as to make any upward adjustment on the basis of factor 10 appropriate.[46] Factor 11 requires no adjustment in this litigation as there is no evidence of any long-term relationship between plaintiffs and their counsel which would influence the fee award. *See Georgia Highway*, 488 F.2d at 719. In view of the further reductions specified in part VII of this opinion, the award is reasonable in the light of similar cases (factor 12).[47]

---

have until ten days after plaintiff's submissions are so received to respond if defendants so desire.

Very truly yours,
/s/
Frank A. Kaufman
cc: Court File

**45.** A district court has discretion to challenge an attorney's fee settlement reached by the parties. *Amalgamated Warbasse Houses*, 721 F.2d at 883–84. That discretion also extends, in this court's view, to the inclusion, in appropriate circumstances, of a contingency bonus even when not originally requested by plaintiffs, particularly if the court is reducing plaintiffs' requests as this court is doing herein. Of relevance in that regard is, as Chief Judge Feinberg noted, the "congressional policy favoring fee awards in order to enforce the civil rights laws

by private litigation" as well as the fact that "[f]ee shifting is still not that common and a statute specifically authorizing it should not be construed in a niggardly manner." *Id.* at 884. *Jones* teaches, albeit in a different context, that a court has an independent duty to ensure that such policies are respected.

**46.** *See Greer v. Holt*, 718 F.2d 206, 208 (6th Cir.1983) (Merritt, J.); *Swann v. Charlotte-Mecklenburg Board of Education*, 66 F.R.D. 483, 486 (W.D.N.C.1975) (McMillan, J.).

**47.** *See Brinkman v. Gilligan*, 697 F.2d 163 (6th Cir.1983); *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 642 (6th Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); *Tasby*, 550 F.Supp. *supra* at 276; *Swann*, 66 F.R.D. *supra* at 486.

Accordingly, plaintiffs' requested award is hereby adjusted to $395,055.00.

## VII

The final step in determining plaintiffs' fee award is to compare the results obtained with the size of the fee. There is little case law beyond *Hensley* itself which illuminates how this comparison should be reflected in the final fee award. In *Hensley*, Justice Powell wrote:

> If ... a plaintiff has received only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonably hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52.

In determining the degree of success, reference is made to plaintiffs' initial request for relief in the motion to reopen in *Vaughns* and the complaint in *NAACP, see Illinois Welfare Rights v. Miller,* 723 F.2d 564, 569 (7th Cir.1983), and to the relief granted by this court in its Order of September 20, 1983. The relief requested in all areas outside of student assignments to schools is disregarded in this analysis because of the exclusions stated in part III of this opinion. In the area of student assignments to schools, plaintiffs, in one significant respect, failed to achieve the relief requested, *i.e.* no immediate changes in student attendance areas were mandated. Otherwise, however, plaintiffs won extensive relief. This court resumed jurisdiction in *Vaughns,* imposed periodic reporting requirements upon defendants, and required consideration by defendants on a continuous basis of the need to achieve unitary status as quickly as possible. Perhaps most important of all, defendants are pres-

ently required to inform this court explicitly concerning the racial impact of each and every formal decision concerning student attendance areas. When the relief obtained is compared with that denied, the former stands out as more than just unimportant decoration and as deeply intertwined with the substance of plaintiffs' complaints. On the other hand, it would seem that plaintiffs achieved "only partial or limited success," not "excellent results" or "exceptional success".

The degree of that limited or partial success is difficult to quantify. In relative terms, if the relief denied went beyond mere form, the relief granted also did so, and, to a greater extent. The relief granted reaffirmed the obligation of defendants to do more than avoid intentional discrimination and reestablished the court's authority to ensure that defendants will live up to that obligation. Given the delicate racial balance of the schools in Prince George's County, the fluid nature of that balance and in particular the history within the Prince George's County school system of "tipping" into one-race institutions, this is vital relief. The significance of the relief denied is particularly difficult to measure because the scope of the request for immediate changes in student attendance areas was never well defined. A few changes here and there would pale in comparison with the actual relief granted herein. Even if this court had required reversal of some of the post-1975 changes, such additional relief would almost surely have been less significant than the relief actually given.

Comparing the success obtained with the fee award as it stands at this point in this opinion, subject to consideration of the success factor, at approximately $395,000, and determining appropriate reductions, if any, is an inexact process. In *Hensley,* Justice Powell wrote:

> There is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that may be eliminated or it may simply reduce the award to account for limited success. The court necessarily

has discretion in making this equitable judgment.

461 U.S. at 436, 103 S.Ct. at 1941, 76 L.Ed.2d at 52.

■ In this litigation, it is hard to say how much testimony and effort would have been omitted had no claim of intentional discrimination been advanced or had no challenge to the validity of certain of the post-1975 boundary changes been made. Much of the testimony which concerned such contentions was relevant to the issue of unitary status. Nevertheless, plaintiffs' partial lack of success coupled with this court's conclusion that some of plaintiffs' evidence was not necessary to achieve the results obtained require, under *Hensley*, that some reduction be made. In that regard, this court considers 10% an approximation of the degree to which the level of success was exceeded by the fee award determined up to this point in this opinion. A more precise determination is not possible because of the intertwined nature of the testimony presented concerning student assignments to schools. Detailed review of the trial transcripts, of plaintiffs' affidavits and of each and all parts of the record, provides an inexact basis for more exact formulation of such reduction. The inability to point to specifics in support of this court's conclusion does not, however, mean that an appropriate percentage reduction should not be determined by this court in the exercise of its discretion.

Accordingly, plaintiffs' claim for attorney's fees is reduced to $355,550.00.

## VIII

Plaintiffs' claim for expenses is divided into ten categories: local transportation, out-of-town travel, postage/freight, computer research, telephone and telegraph, outside photocopying, inside photocopying, depositions and transcripts, court costs and staff overtime. The total request amounts to $30,782.69. Originally, no documentation was presented to this court by plaintiffs in support of its expenses, other than yearly totals divided into each category for 1981 and 1983 and monthly totals for 1982. While courts have not required fully detailed documentation and explanation in connection with each discrete expenditure, plaintiffs' original presentation fell below the applicable standards. Those deficiencies, however, are largely cured by plaintiffs' additional presentation.

■ Defendant's specifically object to plaintiffs' claims for reimbursement for local transportation expenses in the total amount of $261.80, and for out-of-town travel, meals, parking, car rental and lodging in the total amount of $2674.06. While mileage and other travel expenses may be recoverable if related to certain activities such as visiting all or some of Prince George's County far-flung schools,[48] items relating to Baltimore-Washington, D.C. mileage, and lodging in a Baltimore, Maryland hotel rather than return to residences in and around Washington, D.C., are not appropriately recoverable by plaintiffs' counsel in a case in which the fee rates being recognized relate to the total of the combined Washington-Baltimore areas. In this case, plaintiffs have not specified travel expenses which are related to travel to the various schools in Prince George's County as opposed to travel between Washington, D.C. and Baltimore in order to appear in the federal courthouse in Baltimore. Accordingly, the aforementioned claim of plaintiffs in the total amount of $2,935.86 will be disallowed.

■ As to depositions, transcripts, daily copy and staff overtime, defendants' objections would not appear sound, particularly in complicated, difficult litigation such as is

---

**48.** *Palmigiano v. Garrahy,* 707 F.2d 636, 637 (1st Cir.1983); *Dowdell v. City of Apopka,* 698 F.2d 1181, 1192 (11th Cir.1983); *Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623–24 (4th Cir.1978); *Society for Good Will to Retarded Children v. Cuomo,* 574 F.Supp. 994, 1002 (E.D.N.Y.1983); *Crowe v. Lucas,* 479 F.Supp. 1258, 1263 (N.D.Miss.1979); *James v. Beaufort County Board of Education,* 348 F.Supp. 711, 720 (E.D.N.C.1971); *Bradley v. School Board of City of Richmond,* 53 F.R.D. 28 (E.D.Va.1971).

involved herein.[49] It is also to be noted that defendants found it appropriate themselves to order daily copy.

 Defendants also object to certain of plaintiffs' requests for reimbursement as unrelated to issues upon which plaintiffs prevailed. The teachings of *Hensley,* as discussed *supra,* in connection with plaintiffs' fee requests, require recognition of the difficulty of tying each of plaintiffs' expenditures into specific claims for relief and the consequently almost virtual impossibility of precisely allocating each expenditure to an issue upon which plaintiffs have prevailed.[50] However, on a rough justice basis, just as this court has reduced the fee request by approximately 43–½% from plaintiffs' original fee request of $630,-957.75 to $355,550.00, this court believes that a percentage reduction of 43–½% from $30,782.69 to $17,392.00 is appropriate.[51] That approximate 43–½% reduction, *i.e.,* $13,390.69, includes the above-referred-to specific exclusions of $261.88 and $2,674.06 just as the 43–½% reduction included certain specifically excluded items discussed *supra.*

Accordingly, in sum, plaintiffs are hereby awarded fees of $355,550.00 and expenses of $17,392.00 or a total of fees and expenses of $372,942.00.

## IX

The parties are asked to confer and propose a payment schedule for the award of $372,942.00 granted herein. Such schedule should provide for post-judgment interest at the annual rate of ten percent (10%)[52] upon such deferred portions, if any, of the award. The parties' submission in that regard, in one jointly authored document, stating their agreements and also their disagreements, shall be filed on or before November *23,* 1984. After that submission is received, this court will enter an appropriate order in accordance with the within opinion and in the light of the said submission.

**49.** As to daily copy, *see, e.g., Studiengesellschaft Kohle v. Eastman Kodak,* 713 F.2d 128, 133 (5th Cir.1983); *United States v. Bexar County,* 89 F.R.D. 391, 392 (W.D.Tex.1981); *Health-Chem Corp. v. Hyman,* 523 F.Supp. 27, 32 (S.D.N.Y. 1981).

As to transcripts, *see, e.g., Advance Business Systems & Supply Co. v. SCM Corp.,* 287 F.Supp. 143, 162 (D.Md.1968), *aff'd,* 415 F.2d 55 (4th Cir.1969).

As to staff overtime, *see, e.g., Wheeler v. Durham City Board of Education,* 585 F.2d 618, 623 & n. 7 (4th Cir.1978); *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 385–85 & n. 67 (D.D.C.1983), *rev'd on other grounds,* 746 F.2d 4 (D.C.Cir.1984).

**50.** *Danny Kresky Enterprises Corp. v. Magid,* 716 F.2d 215, 219–20 (3d Cir.1983); *Laffey,* 572 F.Supp. at 383–84 & n. 66.

**51.** As to "percentage cuts" as to fees, *see New York State Association for Retarded Children v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983).

**52.** Interest may be allowed under § 1983 both as to fees and costs. *See Spain v. Mountanos,* 690 F.2d 742, 747–48 (9th Cir.1982); *Gates v. Collier,* 616 F.2d 1268 (5th Cir.1980), *modified on reh'g,* 636 F.2d 942 (5th Cir.), *reh'g en banc denied,* 641 F.2d 403 (5th Cir.1981). Under 28 U.S.C. § 1961, the appropriate interest rate is determined by reference to the state law in which the district court is located. Under Maryland law, the interest rate on judgments is ten percent (10%). *See* Md.Ct. & Jud.Proc.Code Ann. § 11–107(a) (1984).